886 F.2d 1449
 58 USLW 2296, 10 UCC Rep.Serv.2d 35
 MBANK ALAMO NATIONAL ASSOCIATION, (Deposit Insurance Bridge
Bank, substituted in the place and stead of MBank
Alamo National Association), Plaintiff-Appellee,
v.
RAYTHEON COMPANY d/b/a Raytheon Medical Systems,
Defendant-Appellant.
MBANK ALAMO NATIONAL ASSOCIATION, (Deposit Insurance Bridge
Bank, substituted in the place and stead of MBank
Alamo National Association), Plaintiff,
E.I. DuPont De Nemours Company, Plaintiff-Appellee,
v.
RAYTHEON COMPANY d/b/a Raytheon Medical Systems, Defendant-Appellant.
 Nos. 88-5576, 88-5590.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 31, 1989.
Rehearing Denied Nov. 30, 1989.
 
 Harold B. Berman and Paul Hoffman, Douglas E. Yeager and Mary Ellen Stumpf, Berman, Mitchell, Yeager & Gerber, Dallas, Tex., for Raytheon Co.
 John E. Clark, Sawtelle, Goode, Davidson & Troilo, San Antonio, Tex., for MBank Alamo Nat. Ass'n.
 Helen G. Schwartz and Lawrence Alan Beck, Beck & Beck, San Antonio, Tex., for E.I. DuPont de Nemours Co.
 Appeals from the United States District Court for the Western District of Texas.
 Before GOLDBERG, REAVLEY and JOLLY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 MBank Alamo National Association ("MBank") and E.I. DuPont de Nemours Company, Inc. ("DuPont") pressed this conversion action against Raytheon Company ("Raytheon"), claiming that Raytheon collected certain accounts receivable, in which MBank and DuPont had security interests superior to those of Raytheon. Raytheon's defense was that it had a purchase money security interest in the accounts receivable. Concluding that Raytheon had no purchase money security interest in the accounts, the district court held that Raytheon's security interests were subordinate to those of MBank and DuPont, and granted MBank's and DuPont's motions for summary judgment. We affirm.
 
 I. Background
 
 2
 MBank and DuPont entered various security agreements with Howe X-ray ("Howe"). By January 10, 1983, in accordance with these agreements, both DuPont and MBank held perfected liens in Howe's present and future accounts receivable. MBank also held a perfected security interest in Howe's present and after acquired inventory.
 
 
 3
 Beginning in January 1983, Raytheon, an x-ray equipment manufacturer, entered a series of transactions with Howe who was one of its distributors. Raytheon agreed to ship x-ray equipment to Howe after Howe contracted with one of its customers for the sale, delivery, and installation of certain Raytheon equipment. In exchange, Howe agreed to assign the specific accounts receivable to Raytheon. Subsequent to the assignments, Raytheon filed financing statements in specific accounts receivable of Howe. Between July 1983 and December 1984, Raytheon collected over $850,000.00.
 
 
 4
 By November 1984, Howe had defaulted on its obligations to MBank and DuPont. MBank and DuPont, pursuant to their security interests, demanded payment from Raytheon from the accounts receivable that it had collected. Raytheon refused, claiming that it had a purchase money security interest ("PMSI") in the accounts receivable and that its interests were therefore superior to those of MBank and DuPont.
 
 
 5
 In addition to its contention that it had a PMSI in the accounts receivable, Raytheon claimed that even if it did not have a PMSI in those accounts, MBank waived its security interest in the accounts. The district court granted MBank's and DuPont's motions for summary judgment, deciding that Raytheon had no PMSI in the accounts receivable and that Raytheon had not raised an issue of MBank's alleged waiver.
 
 
 6
 Raytheon appeals the district court's determination that it did not have a PMSI in the accounts receivable. In the alternative, Raytheon contends that if our construction of the PMSI statutory provisions excludes the Raytheon-Howe transaction, the ruling should not apply to this case under the doctrine of nonretroactivity. Raytheon also appeals the district court's finding that Raytheon failed to produce sufficient evidence of waiver to overcome MBank's motion for summary judgment.
 
 II. Analysis
 A. Purchase Money Security Interests
 
 7
 The rules governing the rights of creditors are set out in Chapter 9 of the Texas Business and Commerce Code ("Code"), which essentially adopted the provisions of the Uniform Commercial Code--Secured Transactions. See Tex.Bus. & Com.Code Ann. Sec. 9.101 et seq. (Vernon 1989).[1] These provisions were enacted "to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty." Sec. 9.101, 1972 Official U.C.C. Comment. In keeping with these goals, rules were enacted prioritizing conflicting security interests in the same property.
 
 
 8
 The general rule provides that the first perfected security interest to be filed has priority and other perfected interests stand in line in the order in which they were filed. See Sec. 9.312(e). PMSIs are excepted from the first-to-file rule and take priority over other perfected security interests regardless of the filing sequence. Sec. 9.312(c), (d). The district court found that Raytheon did not fall within the PMSI exception, that MBank had priority as the first to file, under Sec. 9.312(e)(1), and that DuPont takes second priority since it filed next.[2]
 
 
 9
 Raytheon claims the district court erred by not recognizing its priority in the accounts receivable as a PMSI under Sec. 9.312(d).[3] Section 9.312(d) provides that "[a] purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."
 
 
 10
 As a threshold matter, Raytheon must establish that it meets the statutory definition of a PMSI. Raytheon contends that it fits the statutory requirements of a PMSI under Sec. 9.107(2), which provides:
 
 
 11
 A security interest is a "purchase money security interest" to the extent that it is
 
 
 12
 ....
 
 
 13
 (2) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.
 
 
 14
 To meet these requirements Raytheon must show: (1) that it gave value; (2) that the value given enabled Howe to acquire rights in the accounts receivable; and (3) that the accounts receivable qualify as collateral within the meaning of the statute.
 
 
 15
 The value requirement is satisfied by any consideration sufficient to support a simple contract. See Thet Mah and Assoc. v. First Bank of North Dakota, 336 N.W.2d 134, 138 (N.D.1983); Sec. 1.201(44)(D) (Vernon 1968). Assuming arguendo that Raytheon gave value by extending credit to Howe in exchange for Howe's promise to assign the accounts receivable to Raytheon, see Thet Mah, 336 N.W.2d at 138, Raytheon has failed to satisfy the other two requirements.
 
 
 16
 To create a PMSI, the value must be given in a manner that enables the debtor to acquire interest in the collateral. This is accomplished when a debtor uses an extension of credit or loan money to purchase a specific item. See Ingram v. Ozark Prod. Credit Assoc., 468 F.2d 564, 565 (5th Cir.1972); In re Dillon, 18 B.R. 252, 254 (Bkrtcy.E.D.Cal.1982) (PMSI lien attaches to item actually purchased); Jackson & Kronman, Secured Financing and Priorities Among Creditors, 88 Yale L.J. 1143, 1165 (1979) (PMSI priority limited "to loans that can be traced to identifiable, discrete items of property.").
 
 
 17
 The collateral at issue here is the accounts receivable. In an attempt to force its interest into the PMSI mold, Raytheon has characterized the transaction as follows: "Raytheon, by agreeing to extend credit on its equipment, enabled Howe X-Ray to enter into subsequent contracts of sale with its customers, thereby acquiring rights in the contract accounts which, upon the specific advance and delivery of equipment, blossomed into a right to the collateral accounts receivable." Raytheon, however, cannot force this transaction to fit. To accept this characterization, we would have to close our eyes to the true nature of the transaction.
 
 
 18
 Raytheon, in essence, is claiming that it advanced x-ray machines to Howe on credit, which then enabled Howe to purchase accounts receivable from its customers. This, however, does not comport with our view of commercial reality. While, as Raytheon suggests, it may be theoretically possible to create a PMSI in accounts receivable by advancing funds for their purchase, see Northwestern Nat'l Bank Southwest v. Lectro Systems, 262 N.W.2d 678, 680 (Minn.1977); Gilmore, The Purchase Money Priority, 76 Harv.L.Rev. 1333, 1372 (1963), the same cannot be done by advancing x-ray machines. We view this as a two-step transaction in which Raytheon first advanced machines to Howe for retail sale and, once these machines were sold, Howe then assigned the accounts receivable to Raytheon. Through the credit advance, Howe acquired an interest in the machines, not the accounts receivable. Raytheon's credit advance, therefore, did not enable Howe to acquire an interest in the accounts receivable, as collateral within the meaning of the statute.
 
 
 19
 Additionally, in its characterization of the transaction, Raytheon is attempting to benefit from the PMSI's preferred status in a manner that was not contemplated by the U.C.C. drafters. PMSIs provide an avenue for heavily burdened debtors to obtain credit for specific goods when creditors who have previously loaned money to the debtor may be unwilling to advance additional funds. Jackson & Kronman, Secured Financing and Priorities Among Creditors, 88 Yale L.J. 1143, 1145 & n. 9 (1979). By giving a PMSI holder a priority interest in the specific goods purchased, there is some incentive for a lender to advance funds or credit for the specific transaction. The scope of a PMSI holder's preferred interest, however, is specifically limited by the Code.
 
 
 20
 Under Sec. 9.312(c), a PMSI in inventory is limited to that inventory or to "identifiable cash proceeds received on or before the delivery of the inventory to a buyer...." The drafters noted that general financing of an inventory business is based primarily on accounts resulting from inventory, chattel paper and other proceeds. Sec. 9.312, Official U.C.C. Reasons for 1972 Change comment (4). Reasoning that "[a]ccounts financing is more important in the economy than the financing of the kinds of inventory that produce accounts, and [that] the desirable rule is one which makes accounts financing certain as to its legal position," id., they specifically excluded accounts resulting from the sale of inventory from the protections of a PMSI. Thus, financing statements that are filed on a debtor's accounts take precedence over any subsequent claim to accounts as proceeds of a PMSI in inventory. Additionally, to protect lenders who make periodic advances against incoming inventory, the PMSI holder is required to notify other secured parties before it can take priority. Sec. 9.312(c)(2); see id., 1972 Official U.C.C. Comment comment 3.
 
 
 21
 The priority scheme, however, differs in the context of collateral other than inventory. Under Sec. 9.312(d), a PMSI in collateral other than inventory entitles the holder to a superior interest in both the collateral and its proceeds regardless of any intervening accounts. The differing entitlement to proceeds is due to differences in the expectations of the parties with respect to the collateral involved.
 
 
 22
 Collateral other than inventory generally refers to equipment used in the course of business. See id., Official U.C.C. Reasons for 1972 Change comment (4); Gilmore, The Purchase Money Priority, 76 Harv.L.Rev. 1333, 1385 (1963). Since, unlike inventory, "it is not ordinarily expected that the collateral will be sold and that proceeds will result, [the drafters found it] appropriate to give the party having a purchase money security interest in the original collateral an equivalent priority in its proceeds." Sec. 9.312, Official U.C.C. Reasons for 1972 Change comment (3).
 
 
 23
 Howe's business primarily involved the sale of inventory, which included the Raytheon x-ray machines. See Sec. 9.109(4).[4] The accounts receivable are proceeds resulting from the sale of the machines. MBank and DuPont took security interests in the accounts receivable, in accordance with their expectation that sale of the inventory would generate the accounts. If we were to accept Raytheon's argument that it holds a PMSI in Howe's accounts receivable, we would be giving Raytheon a priority interest in the proceeds of inventory, in direct contravention to the express intent of the drafters. Additionally, Raytheon would have successfully avoided the notice requirements of Sec. 9.312(c)(2).
 
 
 24
 Raytheon argues, however, that the policies underlying PMSIs actually favor recognizing Raytheon's priority interest in Howe's accounts. It points out that Howe could find no other source of financing besides Raytheon and that "MBank and DuPont benefited by the financing arrangements because the extension of [credit] by Raytheon helped Howe X-ray stay in business thereby servicing its debts." Raytheon also contends that if the Code is interpreted to limit the security interests of creditors, such as Raytheon, to a mere promise of repayment and the grant of a PMSI in inventory, a "valuable source of credit" to similarly encumbered debtors would "dry up." This is because the risk of default is too great in the face of prior liens on the debtor's accounts.
 
 
 25
 The Code itself, however, answers this argument. The drafters were apparently well aware that the failure to extend a PMSI holder's priority status to the resulting accounts would provide less incentive for inventory financiers to provide credit. See Sec. 9.312, 1972 Official U.C.C. Comment comment 8. Yet, they did not extend the protections of a PMSI and merely noted that "[m]any parties financing inventory are quite content to protect their first security interest in the inventory itself, realizing that when inventory is sold, someone else will be financing the accounts and the priority for inventory will not run forward to the accounts." Id. The drafter's recognition of the problem and the statutory favoring of accounts financing demonstrate that the drafters were not overly concerned that this source of financing would "dry up."
 
 
 26
 Additionally, Raytheon had alternative means of securing its right to receive payment. Besides obtaining a PMSI in the inventory by complying with the Sec. 9.312(c)(2) notice requirements, it could have entered subordination agreements with MBank and DuPont on the specific accounts resulting from the sale of Raytheon's x-ray machines. It also could have sold the machines to Howe's customers who would have paid Raytheon directly, with Howe receiving a commission on the sale. If Raytheon had followed either of these courses, it would not have subverted the notice and filing requirements of the Code. As this transaction goes beyond that contemplated by the PMSI provisions, we decline "to expand the scope of special protection afforded a purchase money security interest, lest in so doing we defeat the underlying purposes of the Code: to bring predictability to commercial transactions." Mark Prod. U.S., Inc. v. Interfirst Bank Houston, N.A., 737 S.W.2d 389, 393 (Tex.App.--Houston [14th Dist.] 1987).
 
 
 27
 Since Raytheon did not have a PMSI in Howe's accounts receivable, the first-to-file priority rules govern. See Ford Motor Credit Co. v. First State Bank of Smithville, 679 S.W.2d 486, 487 (Tex.1984). As the last to file, Raytheon's interest is subordinate to those of MBank and DuPont.
 
 B. The Doctrine of Nonretroactivity
 
 28
 Having concluded that Raytheon did not have a PMSI, Raytheon now contends that because this case presented a novel question of law, the doctrine of nonretroactivity should apply. Under the doctrine of nonretroactivity a court deciding a question of first impression, in a manner that was not clearly foreshadowed, makes the ruling inapplicable to the parties before it. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). This is no case for nonretroactivity. The holding that Raytheon did not have a PMSI in the accounts receivable is required by the statute and commentary, given the PMSI restrictions and the Code's clear mandate that first-to-file rules establish the priorities in accounts resulting from the sale of inventory. The goal of providing predictability in commercial transactions is furthered by the present application of our holding. Moreover, we find no inequity in applying the rule to Raytheon. Raytheon's credit managers were well aware of the first-to-file rule yet, at no time, attempted to notify MBank or DuPont about its purported interest in the accounts. It did not pursue alternative means of securing payment, but merely claimed a priority right in the absence of any authority to do so.
 
 C. Waiver
 
 29
 Lastly, Raytheon contends that the district court erred in holding that Raytheon failed to produce sufficient evidence that MBank waived its security interest in the accounts to overcome MBank's motion for summary judgment. To support its claim, Raytheon presented evidence that MBank was informed that Howe and Raytheon were engaged in ongoing credit negotiations and that Howe was assigning the accounts receivable to Raytheon. Additionally, while MBank was aware that it was not receiving full payment of Howe's accounts receivable, MBank never requested that the accounts proceeds be segregated or held in trust for the bank.
 
 
 30
 Waiver is a valid defense to an action to enforce a security interest. Weisbart & Co. v. First Nat'l Bank of Dalhart, Texas, 568 F.2d 391, 396 (5th Cir.1978); Montgomery v. Fuquay-Mouser, Inc., 567 S.W.2d 268, 270 (Tex.Civ.App.1978). Under Texas law, "[w]aiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming it, with full knowledge of the material facts." Montgomery, 567 S.W.2d at 270.
 
 
 31
 Although Raytheon's evidence suggests that MBank knew about the assignment of the accounts receivable, the assignment alone did not interfere with MBank's rights, because any assignment would be subordinate to MBank's security interest. MBank's rights were not infringed until Raytheon collected the accounts receivable. To raise the issue of whether MBank intended to relinquish its security interest in the accounts receivable, Raytheon would at least have to present evidence that MBank knew Raytheon was collecting the accounts. Raytheon did not do so. The district court properly granted the motions for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Washington v. Armstrong World Indus., 839 F.2d 1121, 1122-23 (5th Cir.1988) (per curiam). The judgments for MBank and DuPont are AFFIRMED.
 
 GOLDBERG, Circuit Judge, dissenting:
 
 32
 What we confront today is another nettle in the thicket of the Texas Uniform Commercial Code. A thorny question of statutory interpretation that could cause scratch and abrasion if not reconnoitered under the illumination provided by the Texas Supreme Court. After examining the relevant statutes and commentaries, however, I believe that the majority has not construed the code as would the Texas Supreme Court in the face of the same problem. So because the scratch of a thorn may cause infection if not properly treated, I must respectfully DISSENT.
 
 
 33
 The nettle of this case is whether an account receivable should be considered "collateral" in the words of the purchase money security interest statute so that the purchase money interest has priority over a security interest previously perfected in an identical account. My belief is that accounts receivable are an appropriate form of collateral because they can be used to invigorate marginal businesses. I would thus hold that Raytheon established a purchase money security interest in the specified accounts of Howe x-ray.
 
 I. THE FACTS
 
 34
 Both MBank and DuPont had loaned money to Howe, a dealer in medical equipment including expensive x-ray machines. To guard against the possibility that Howe would default on these loans, MBank, whose loan was made before DuPonts, perfected a security interest in Howe's accounts receivable then existing and subsequently arising and also perfected a similar security interest in Howe's inventory. DuPont's security interest was also perfected in Howe's accounts receivable then existing and subsequently arising but was filed after MBank's interest.
 
 
 35
 While the MBank/DuPont loans were outstanding, Raytheon entered into a series of transactions with Howe. Each transaction was executed according to a preexisting distribution agreement which allowed Howe to contract with customers for the sale of Raytheon x-ray machines. Under this agreement, Raytheon promised to supply an x-ray machine to Howe in exchange for Howe's promise to assign the account receivable that arose from the sale of the machine to Raytheon. Raytheon gave notice of its security interest in each account by filing a financing statement within the applicable 20 day period after the creation of the account. The structure of this agreement between Howe and Raytheon arose because Howe had begun to experience difficulty in obtaining additional financing and was spiraling down toward bankruptcy, its final fate.
 
 II. DISCUSSION
 
 36
 Before I get involved in the details of Raytheon's purchase money security interest, however, a momentary step back is in order to scan the general landscape of security interests. As a general observation, the usual method for growth in the area of commercial law has been the daring creativity of a company pushing out beyond the boundaries of "normal practice" in response to business exigencies. The history of trust receipts, the factor's liens, and the eventual adoption of Article 9 of the Uniform Commercial Code illustrates this general observation in the area of security interests. See G. Gilmore, Security Interests in Personal Property, Ch. 1-8 (1965).
 
 
 37
 "The idea which the draftsmen [of Article 9] started with was that the system of independent security devices [developed in different area of commerce] had served its time; that the formal differences which separated one device from another should be scrapped and replaced with the simple concept of a security interest in personal property; that all types of personal property, whether held for use or for sale, should be recognized as available for security." Id. at 290 (emphasis added).
 
 
 38
 Article nine was thus intended to be a flexible statute that could respond to divergent commercial needs.
 
 
 39
 The facts of this case present exactly the type of problematic situation which demands a creative solution. Raytheon, as a manufacturer of expensive x-ray equipment, often does not seek out customers itself but instead uses local distributors such as Howe to make sales. But Howe had to borrow money for it to function as a merchant of medical equipment. MBank and DuPont provided this money protecting themselves by with security interests in the collateral Howe had available, Howe's present and future accounts receivable and inventory. This type of security interest in a borrower's intangibles such as accounts receivable is extremely common. The key to who has priority is to determine who filed the security interest in the collateral first. First in time, first in line goes the rhyme.
 
 
 40
 The problem with this situation is that a manufacturer will not loan or give a heavily indebted merchant any goods to sell on credit because once the merchant sells the goods, the banker, not the manufacturer, will have priority in the resulting accounts under the first in time first in line principle. Raytheon would thus not advance any x-ray machines to Howe because MBank and DuPont would have priority in any accounts that arose from the sale of the machines. Yet it is these very sales which would enable Howe to make profits to pay off its loans to MBank and DuPont. So how does an indebted merchant, who is unable to pay a manufacturer for goods that the merchant must sell to service the banker's loan, stay in business? Often what occurs is a scenario where the banker's loan is not paid, the merchant goes out of business, and the manufacturer loses an opportunity to distribute its goods on the market.
 
 
 41
 Article 9 provides a solution: the purchase money security interest. This device, with its root in the Railroad Car Trusts of the Nineteenth Century, has priority over security interests filed earlier because of its specific transaction oriented function. Id. at 743-53 (citing U.S. v. New Orleans R.R., 79 U.S. (12 Wall.) 362, 364-65, 20 L.Ed. 434 (1871) (pre Erie commercial case giving priority to the later in time party)). The purchase money security interest operates outside the notice principle which favors early interest holders over later ones. Notice is not the driving force behind the purchase money security interest.
 
 
 42
 It was this purchase money device that allowed Howe an opportunity to continue doing business to the benefit of MBank, DuPont and Raytheon. Howe did not have enough money to purchase a $140,000 x-ray machine for inventory but Raytheon would not advance a machine on credit to Howe. A creative alternative was necessary. Raytheon agreed to advance a machine to Howe in exchange for Howe's enforceable purchase order or account receivable. Raytheon thus used the account as a vehicle to ensure Howe's payment for the machine. It was a creative solution to the meeting of two creditors, a manufacturer of expensive equipment, and a heavily indebted retailer, that allowed commerce to continue to flow.
 
 
 43
 But for the law to recognize this creativity, it must be determined whether Raytheon has complied with the elements of the Texas purchase money security interest statute. Admittedly this arrangement does not present a paradigmatic purchase money security interest, but I believe that creativity, when in harmony with the statutory requirements, should be encouraged.
 
 A. THE VALUE REQUIREMENT
 
 44
 Purchase money security interests are defined in section 9.107 of the Texas Uniform Commercial Code.[1] Section 9.107, states, in pertinent part:
 
 
 45
 A security interest is a "purchase money security interest" to the extent that it is ... (2) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.
 
 
 46
 Under the statute, Raytheon must satisfy three requirements. Raytheon must demonstrate that: (1) it gave value to Howe by making advances or incurring an obligation; (2) its extension of value enabled Howe to acquire rights in the collateral--the account receivable in each particular transaction; and, (3) the Texas U.C.C. recognizes an account receivable as collateral for the purposes of a purchase money security interest.
 
 
 47
 There is no question that Raytheon extended value. Raytheon gave value when it shipped, according to the purchase order, an x-ray machine that a particular customer had ordered. This interpretation of the value requirement is consistent with the definition of value as set out in section 1.201(44) of the Texas Uniform Commercial Code. Section 1.201(44) is applicable through the direction of the definitional cross reference of section 9.107. It states in pertinent part, that: "[a] person gives 'value' for rights if he acquires them ... (D) generally, in return for any consideration sufficient to support a simple contract." Raytheon satisfied section 1.201(44) because the advance of the x-ray machine in exchange for a promise from Howe to assign an accounts receivable arising from the sale of that x-ray machine is consideration sufficient to support a contract. Moreover, under section 9.107(2) itself, " 'A secured party may give value by committing ... to supply goods or [by] actually supply[ing] the goods.' " Thet Mah and Associates Inc. v. First Bank of North Dakota, 336 N.W.2d 134, 138 (N.D.1983) (citing 1 Bender U.C.C. Service, Secured Transactions, section 4.05(4) p. 304 (1983).[2]
 
 
 48
 This advance also satisfied the limitation on the type of value that may be given as defined in comment 2 of section 9.107.[3] Comment 2 states, in pertinent part:
 
 
 49
 "[t]his section ... provides that the purchase money party must be one who gives value " 'by making advances or incurring an obligation' ": the quoted language excludes from the purchase money category any security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt."
 
 
 50
 This antecedent debt limitation is satisfied here because Howe's debt to Raytheon was not preexisting but was instead created by the advance of the machine. Only then was Howe indebted to Raytheon for the machine's value. In turn, the debt was secured by the accounts receivable that Howe assigned to Raytheon pursuant to their agreement.
 
 B. THE ENABLING REQUIREMENT
 
 51
 The second element of a purchase money security interest is the requirement that Raytheon give value "to enable" Howe to acquire rights in the particular account receivable.[4] This requirement means that the advance made by Raytheon must have made it possible for Howe X-ray to obtain the collateral.[5] In the present case, the enabling requirement is satisfied because Raytheon's agreement with Howe, which preceded all of the particular transactions, was that Raytheon would advance an x-ray machine to Howe in exchange for an accounts receivable generated by Howe's sale of the machine to a customer. This preexisting agreement, together with the advance of the machine by Raytheon, enabled Howe to make the sale. At the same moment in time, in the twinkling of an eye, the sale created the particular account receivable payable to Howe which Howe then assigned to Raytheon pursuant to their preexisting agreement. "If the loan transaction appears closely allied to the purchase transaction, that should suffice. The evident intent of paragraph (b) [U.C.C. 9-107(b) ] is to free the purchase-money concept from artificial limitations; rigid adherence to particular formalities and sequences should not be required." G. Gilmore, I Security Interests in Personal Property, 782 (1965).[6]
 
 C. THE COLLATERAL REQUIREMENT
 
 52
 The thorny question in this case centers on whether accounts receivable should be considered collateral for the purpose of a purchase money security interest under Section 9-107(b). To my mind, Raytheon has jumped this hurdle.[7]
 
 
 53
 Under section 9.105(a)(3), which is listed in the definitional cross references of section 9.107, collateral is defined as "the property subject to a security interest and includes accounts and chattel paper which have been sold...." Moreover, under section 9.106, which is also listed in the definitional cross references of section 9.107, "[a]ccount means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." The comment to 9.106 states that the section is referring to "ordinary commercial accounts receivable." By reading these two definitional sections in tandem, it is clear that an account receivable can be collateral for the purposes of a purchase money security interest under section 9.107.
 
 
 54
 There is, however, no other authority to our knowledge that expressly states that accounts receivable should be considered collateral for the purpose of a purchase money security interest. The Supreme Court of Minnesota has suggested that a purchase money security interest in accounts could validly arise. See Northwestern National Bank Southwest v. Lectro Systems, 262 N.W.2d 678, 680 (Minn.1977) ("This is not a case in which funds were advanced and used for purchase of a receivable."). And, Professor Grant Gilmore, one of the original drafters of article 9, has stated in his treatise on security interests, that the purchase money concept might apply to intangible property in occasional cases. G. Gilmore, I Security Interests in Personal Property, 781 (1965) ("There seems to be no reason, however, why the term 'collateral' should have other than its normal meaning: the purchase-money concept may thus, in an occasional case, apply to intangible property....").
 
 
 55
 MBank and DuPont have asserted that accounts receivable should not be considered collateral for the purpose of defining a purchase money security interest under Section 9.107(2). Their argument, adopted by the majority, is that because accounts receivable financing has been accorded a special importance by the Texas Uniform Commercial Code, its legal position should not be made less certain by the operation of Sections 9.107(2) and 9.312(d). Once a security interest has been created under section 9.107(2), section 9.312(d) grants it special status. Section 9.312(d) states that "a purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."[8]
 
 
 56
 The significance of this special priority granted to purchase money security interests in subsection (2) becomes apparent when compared to the general priority rule in section 9.312(e). Under section 9.312(e)(1), conflicting security interests in the same collateral rank according to the time of filing. The first party to file notice of its interest in an account has priority over any subsequently filed interests in the identical account.
 
 
 57
 Because of the operation of section 9.312(d), however, the first party to file notice of a security interest in an account would not necessarily have priority under section 9.312(e)(1). Section 9.312(d) would grant priority over any interest filed previously in the same account if purchase money status in the account was first established under section 9.107. The legal position of accounts receivable financing might thus be made less certain if a purchase money security interest could be claimed in accounts receivable under section 9.107(2). Diminished certainty could result in the sense that the first party to file notice of its interest in an account under section 9.312(e) would be uncertain as to whether it had priority in the account or whether another party has priority because the latter established purchase money status in the same account under 9.107(2).
 
 
 58
 MBank and DuPont argue that this uncertainty in the legal position of accounts receivable financing should be prohibited because of the special importance accorded to accounts receivable financing under the code. They find this importance in the history of section 9.312(c) which prohibits the establishment of purchase money security interests in accounts receivable, derivatively, as proceeds of inventory. The argument points out that this prohibition was created due to the importance of accounts receivable financing in the economy. Based on these premises, the argument concludes that the possibility of a purchase money security interest in accounts receivable under section 9.107(2) should also be prohibited. The fallacy of this logic, however, is that it equates the value of accounts receivable as applied to a problem that arose in the area of inventory financing with the values behind the section 9.107 purchase money security interest.
 
 
 59
 The argument thus rests upon MBank and DuPont's interpretation of section 9.312(c). Section 9.312(c) provides that "a perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in any identifiable cash proceeds received on or before the delivery of inventory to a buyer."[9] This section of the code was changed in 1972 to address the problem of priority conflicts between a claim to accounts receivable derivatively as proceeds of inventory and a claim to the accounts established by the filing of a direct security interest.[10] The conflict arose between inventory financiers who claimed priority in the accounts as proceeds of the inventory that they helped the debtor to acquire and lenders who had taken a direct security interest in the accounts as collateral for money loaned to the debtor.
 
 
 60
 Section 9.312(c) offered a solution to this conflict. It states that a prior right to the inventory of a debtor does not confer a prior right to any proceeds that arise from the sale of the inventory except for identifiable cash proceeds. There is no prior right to accounts receivable as proceeds from the sale of the inventory. Under this section, it would not be possible to establish a purchase money security interest in inventory and then claim a purchase money security interest in any of the accounts that arose from the sale of that inventory. This exclusion of accounts receivable as proceeds of inventory under section 9.312(c) rests upon the assumption that accounts receivable financing is more important in the economy than the financing of the types of inventory that produce accounts when sold.
 
 
 61
 MBank and DuPont thus argue that a purchase money security interest in accounts receivable should not be permitted under section 9.107(2) because a purchase money security interest in accounts receivable may not be claimed derivatively as proceeds of the sale of inventory under section 9.312(c). However, when this argument is examined in light of the policy interests underpinning section 9.107(2), the argument's core assumption, the importance of accounts receivable financing in the economy, dictates precisely the opposite result.
 
 
 62
 The most important policy justification for a purchase money security interest under section 9.107(2) is the protection that it gives to a debtor who is unable to raise additional funds to remain in business. Creditors who have previously loaned money to the debtor and taken a security interest in the debtor's goods may be unwilling to advance additional value or funds.[11] These additional funds, however, could enable a debtor to purchase goods, make sales, and in turn, generate profits. Profits which could not only be used to create more business, but also, to allow the debtor to pay off the creditor's loans. The purchase money security provisions thus enable a leveraged debtor who is able to find a new lender to give that new lender a first claim on the new collateral purchased notwithstanding a prior filing by another creditor.[12]
 
 
 63
 The arrangement between Raytheon and Howe exemplifies the use of accounts receivable to advance the policy rationale behind the purchase money security interest. It was the use of the accounts receivable by Raytheon as collateral for the x-ray machines that allowed Howe to continue to do business. The additional business that Howe was able to generate with the advance of the x-ray machines, at minimum, gave Howe an additional opportunity to stay in business. This opportunity was a benefit to creditors such as MBank and DuPont whose loans would not be repaid unless Howe had the ability to generate profits. It also demonstrated the importance of accounts receivable financing in another forum, the creation of purchase money security interests.
 
 
 64
 The use of accounts receivable as collateral in this case benefited MBank and DuPont as creditors because the consequences of an unpaid account were relatively greater to Raytheon. Raytheon, MBank and DuPont would each have been harmed if Howe's customers failed to pay their accounts. If an account receivable were to remain unpaid, Raytheon would lose the entire value of the x-ray machine advanced to Howe. In contrast, it is unlikely that the failure of one account would drive Howe into bankruptcy so that Howe would be unable to repay MBank and DuPont. Yet it is this additional risk taken by Raytheon which allowed Howe a profit that could be used to fund its business to the advantage of MBank and DuPont.
 
 
 65
 Finally, any obligation imposed on MBank and DuPont to determine whether Howe was using its accounts receivable to collateralize purchase money security transactions is diminished in two respects. First, as stated, it is these very purchase money transactions that allowed Howe an additional opportunity to service its debts to these creditors. Second, MBank and DuPont as creditors had already established relationships with Howe. In future transactions, it would not have been difficult for them to ascertain whether Howe was using any accounts to collateralize purchase money transactions with other creditors and draft the loan contracts accordingly.
 
 
 66
 D. THE LIMIT OF RAYTHEON'S PURCHASE MONEY SECURITY INTEREST
 
 
 67
 I would, however, posit a serious limit on the extent of Raytheon's purchase money security interest. Under section 9.107, a security interest has purchase money character only to the extent of the value given to acquire the collateral. In the present case, the value given by Raytheon was the price of the x-ray machine as measured by the difference in the price Howe charged customers and the price Raytheon charged Howe. This price measures the extent of Raytheon's purchase money security interest in the specific accounts receivable of Howe. I do not mean to imply that the value given to a distributor such as Howe will always be measured by the wholesale price. In some situations, it could be the retail price depending upon what the debtor was meant to gain by the transaction. I would leave these transactional details for the district court.
 
 
 68
 The difference between the price Raytheon charged Howe and the price Howe charged its customers would thus not be a part of Raytheon's purchase money security interest. There is evidence to the effect that Howe used a portion of this difference, Howe's profit margin, to pay a preexisting debt owing from Howe to Raytheon. This money could not be a part of Raytheon's purchase money security interest because a purchase money security interest may not be used to secure a preexisting debt.[13]
 
 
 69
 There is also evidence which suggests that Raytheon may have loaned money to Howe to cover Howe's costs of installing the x-ray machine. Any such money would not be a part of Raytheon's purchase money security interest. There should not be any additional opportunities created under the code to give simple loans purchase money character.[14]
 
 
 70
 To my mind, Raytheon has established a valid purchase money security interest under section 9.107(2) of the Texas Uniform Commercial Code. The x-ray machine advanced by Raytheon constituted the value that enabled Howe to acquire accounts receivable, the collateral, for the purposes of section 9.107(2). As such, this case should be reversed and remanded, where the issue of waiver could be examined with a headlight's incandescence and the retroactivity issue appropriately explored. I therefore respectfully DISSENT.
 
 
 
 [1]
 All statutory references in this opinion are to the Texas Business & Commerce Code unless otherwise indicated
 
 
 [2]
 The district court also found that because MBank had a continuously perfected interest in the inventory since January 17, 1980, MBank has priority in the accounts as proceeds of inventory under Sec. 9.306(c). Because we reach our decision under Sec. 9.312(e)(1), we need not discuss this finding
 
 
 [3]
 Raytheon claims a PMSI in the accounts receivable and not in the inventory. Raytheon cannot claim a PMSI in this inventory because it did not comply with Sec. 9.312(c)(2), which requires a PMSI holder to notify in writing the holder of a conflicting security interest in the same inventory
 
 
 [4]
 "The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale." Sec. 9.109(4), 1972 Official U.C.C. Comment comment 3
 
 
 [1]
 Tex.Bus. & Comm.Code Ann. Section 9.107 (Vernon 1968 and West Supp.1989)
 
 
 [2]
 See Gilmore, The Purchase Money Security Priority, 76 Harv.L.Rev. 1333, 1375 (1963) ("The something [given as value] need not be a purse of gold or its present day negotiable equivalent.")
 
 
 [3]
 Texas Bus. & Comm.Code Ann. section 9.107 (Vernon 1968 and West Supp.1989)
 
 
 [4]
 Howe's rights in the collateral, the accounts receivable that Howe assigned to Raytheon, have not been contested
 
 
 [5]
 See Gilmore, supra note 2 at 1373 (1963)
 
 
 [6]
 See In re McHenry, 71 B.R. 60, 62 (Bkrtcy.N.D.Ohio 1987) (debtor acquires collateral based on preexisting agreement that funds will subsequently be advanced to pay for the collateral); In re Sherwood, 79 B.R. 399, 400 (Bkrtcy.W.D.Wis.1986) (preexisting loan agreement enabled debtor to acquire collateral even though loan funds disbursed after collateral acquired); Thet Mah and Associates v. First Bank of North Dakota, 336 N.W.2d 134, 138 (N.D.1983) (enabling requirement satisfied by loan commitment which allowed debtor to purchase collateral even though the actual funds were received after the installation of the collateral). But see Northwestern National Bank Southwest v. Lectro Systems, 262 N.W.2d 678, 680 (Minn.1977) (creditor did not establish a purchase money security interest because the funds were not used to acquire a receivable but were instead used for the performance of an already existing contract)
 
 
 [7]
 MBank and DuPont argue that Raytheon does not have purchase money security interest in the accounts receivable of Howe. They contend that the proper way to characterize the transaction between Raytheon and Howe is to view Raytheon as having advanced credit to Howe. This credit, the argument continues, allowed Howe to purchase inventory from Raytheon in the form of the x-ray machine. Thus, according to MBank and DuPont, the x-ray machine served as collateral to secure the advance of the credit from Raytheon. Howe then sold the x-ray machines to its customers. The sales created accounts receivable which Howe assigned to Raytheon
 The implication of MBank and DuPont's characterization of the transaction between Raytheon and Howe is that MBank and DuPont have priority in the accounts receivable over Raytheon because Raytheon would not be able to claim a valid purchase money security interest. Raytheon would not be able to claim a purchase money security interest under section 9.312(d) because this section requires that the interest be taken in collateral other than inventory. Section 9.312(d) states that "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."
 Raytheon would thus have to claim a purchase money security interest under another section because according to MBank and DuPont, the collateral in the transaction was inventory. The purchase money security interest would have to be justified under section 9.312(c) which applies to purchase money security interests in inventory. Section 9.312(c)(2) requires "the purchase money secured party [to give] notification in writing to the holder of conflicting security interests if the holder has filed a financing statement covering the same type of inventory." Raytheon, however, failed to give any notice to MBank or DuPont and could not, therefore, establish a valid purchase money security interest under this section.
 Because Raytheon would be precluded from claiming a purchase money security interest under section 9.312(c) or section 9.312(d), MBank and DuPont would have priority over Raytheon in the accounts receivable of Howe under section 9.312(e). Section 9.312(e) states that "conflicting security interests rank according to priority in time of filing or perfection." Therefore, because both MBank and DuPont filed notice of their claims prior to Raytheon, they would have superior interests under section 9.312(e).
 This analysis, however, suggested by MBank and DuPont begs the question. The question is whether Raytheon established a purchase money security interest in the accounts receivable of Howe not whether Raytheon properly perfected a purchase money security interest in the inventory of Howe. The analysis of whether Raytheon properly perfected a security interest in the inventory of Howe assumes that MBank and DuPont's characterization of the transaction is correct. But the very question to be decided is how to characterize the transaction for the purposes of defining a purchase money security interest. Nothing in the code mandates that Raytheon to claim a purchase money security interest in Howe's inventory. Raytheon claimed a purchase money security interest in the accounts receivable of Howe. The question is thus whether accounts receivable may be considered collateral for the purposes of a purchase money security interest.
 
 
 [8]
 Tex. Bus. & Comm.Code Ann. section 9.107 (Vernon 1988 and West Supp.1989)
 
 
 [9]
 Tex. Bus. & Comm.Code Ann. section 9.312(c) (Vernon 1988 and West Supp.1989)
 
 
 [10]
 Id
 
 
 [11]
 Jackson and Kronman, Secured Financing and Priorities Among Creditors, Yale L.J. 1143, 1165 (1979) (economic analysis suggesting that purchase money security interests may be used to free debtor from creditor's situational monopoly)
 
 
 [12]
 White and Summers, Uniform Commercial Code, 1043 (1972)
 
 
 [13]
 Tex. Bus. & Comm.Code Ann. section 9.107 (Vernon 1988 and West Supp.1989) (comment 2)
 
 
 [14]
 White and Summers, infra note 12 at 1045 n. 35 (1972)