**FIRST INTERSTATE BANK OF UTAH, N.A., Appellant,**

v.

**INTERNAL REVENUE SERVICE, and Olympus Glass Company, Inc., Appellees.**

**No. 90–4021.**

United States Court of Appeals, Tenth Circuit.

April 25, 1991.

George W. Pratt of Jones, Waldo, Holbrook & McDonough (Jerome Romero of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, with him on the briefs), for appellant.

Deborah Swann (Dee V. Benson, U.S. Atty., Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and David I. Pincus, Tax Div., Dept. of Justice, Washington, D.C., with her on the briefs), for appellees.

Before LOGAN, Circuit Judge, ALDISERT* and SEYMOUR, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal from the district court's affirmance of the bankruptcy court's order requires us to interpret *Utah Code Ann.* § 70A-9-107(b), which provides that:

> [a] security interest is a purchase money security interest to the extent that it is ... taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

First Interstate Bank of Utah, N.A., the appellant, argues that it obtained a purchase money security interest in certain accounts receivable when it advanced funds to Olympus Glass Company, the debtor in a Chapter 11 proceeding, enabling the debtor to complete performance of specified obligations. This question of statutory construction is a legal issue of first impression before this court. At issue here is whether the statute affords purchase money priority to First Interstate to preempt a tax lien

* Ruggero J. Aldisert, United States Circuit Judge for the Third Circuit, sitting by designation.

previously asserted by the Federal Government.

Jurisdiction was proper in the bankruptcy court pursuant to 28 U.S.C. § 1334(b) and 157 and Rule B–105 of the U.S. District Court for the District of Utah Rules of Bankruptcy Practice. Jurisdiction was proper in the district court based on 28 U.S.C. § 158(a). Jurisdiction on appeal is proper based on 28 U.S.C. § 1291. Appeal was timely filed under Rule 4(a), F.R.A.P.

## I.

At a time when the debtor's assets were subject to a federal tax lien, First Interstate and Olympus Glass entered into a financing arrangement whereby the bank agreed to fund Olympus' performance of six glazing contracts. The bank paid the material and labor cost incurred by Olympus. After Olympus went into bankruptcy the question arose as to whether the tax lien was to be afforded the normal consequences of a lien filed prior in time to the extension of credit. While recognizing the existence of orthodox rules of lien priority, First Interstate relies upon a competing legal precept that a purchase money security interest has priority over a previously filed tax lien.

■ The general proposition is that a security interest based on the extension of purchase money defeats a previously filed federal tax lien. *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978) ("[T]he [Internal Revenue] Code and established decisional principles subordinate the tax lien, to certain perfected security interests in ... collateral which is subject to a purchase-money mortgage regardless of whether the agreement was entered into before or after the filing of the tax lien.") *Id.* at 257–58, 98 S.Ct. at 1790–91 (footnotes omitted). Although a statement of this priority is not found in the express language of the Code, "[t]he purchase-money mortgage priority is based upon recognition that the mortgagee's interest merely reflects his contribution of property to the taxpayer's estate and therefore does not prejudice creditors who are prior in time." *Id.* at 258 n. 23, 98 S.Ct. at 1790–91 n. 23.

The parties before us urge diametrically opposed interpretations of the U.C.C. provision defining a purchase money security interest. First Interstate argues that the phrase, "a person who by making advances ... to enable the debtor to acquire rights in or the use of collateral" brings it within the statutory definition when it extended money secured by accounts receivable. The Internal Revenue Service (IRS) contends that the money was extended to perform pre-existing contracts of the debtor and did not represent funds advanced to acquire property or rights in property.

■ The facts are not in dispute. The bankruptcy court's conclusions of law affirmed by the district court are subject to *de novo* review. *In re Schneider*, 864 F.2d 683, 685 (10th Cir.1988).

## II.

Olympus is a glazing contractor and wholesale supplier of glass. On January 23, 1984, First Interstate extended to Olympus a $500,000 line of credit. Pursuant to this line of credit, Olympus drew down the entire amount. The line was secured by an Accounts Receivable and Inventory Security and Loan Agreement by which Olympus conveyed to First Interstate a security interest in all of Olympus' accounts (as defined in the agreement) "now existing or hereafter existing" and "all the proceeds of ... the foregoing." The bank filed the U.C.C.–1 financing statement with the Utah Secretary of State, thereby perfecting its security interest in the debtor's accounts and proceeds. On August 1, 1985, the IRS filed a Notice of Federal Tax Lien against the debtor in the amount of $57,147.94 for unpaid taxes withheld from the wages of the debtor's employees.

Several months later, First Interstate agreed to extend to the debtor a secured line of credit in the amount of $200,000, known as "[a] revolving loan." Pursuant to the agreement, signed on November 27, 1985, the loan was to be "secured by specifically assigned contracts." Borrowing was limited to the "amounts necessary for pay-

ment of direct labor expense and materials" and in no event was to "exceed 75% of the face value of the assigned contract." These advances were to be based on invoices for materials and appropriate records of labor expended on the contract, "with such invoices and records subject to Bank approval prior to disbursal of each advance." First Interstate signed a promissory note for the loan.

First Interstate did not file a U.C.C.–1 financing statement in conjunction with the November Security Agreement; instead it relied on the financing statement accompanying the previous loan that it had filed on January 23, 1984, some twenty months earlier. The prior financing statement covered "[a]ll present and future accounts" of the debtor. The bankruptcy court accepted the January filing as a document perfecting a security interest, but did not raise it to the dignity of purchase money status. Olympus used no source of financing other than the advances from First Interstate to perform the contracts.

On July 2, 1986, Olympus filed a voluntary Chapter 11 petition. In November 1986, the debtor, the IRS, and First Interstate entered into a stipulation under which the IRS and First Interstate entered into certain agreements relating to the use by the debtor of certain funds, including a $10,000 deposit with the Clerk of the Bankruptcy Court and $6,012.89 in proceeds of certain other pre-petition accounts, held by the IRS pursuant to the stipulations.

In the bankruptcy court, as before us, First Interstate argued that its lending arrangement with the debtor falls squarely within the definition of a purchase money security interest: It advanced approximately $193,000 to fund the performance of specific, identified glazing contracts by issuing cashier's checks directly to third party suppliers of materials and labor. Accordingly, the bank argued, it is a "person" who "by making advances," gave "value to enable the debtor to acquire rights in … the … collateral," i.e., the accounts receivable that arose by virtue of performance of the glazing contracts. It conceded that the federal tax lien attached to the debtor's

"contingent rights to payments under the Glazing Contracts," but argued that its funds enabled the debtor "to convert the contingent rights into matured rights." Trial Brief at 4–5.

The IRS responded, and the bankruptcy court agreed, that within the concept of purchase money security rights a fundamental difference exists between those funds advanced to purchase or acquire contracts and any accompanying accounts receivable, and those funds advanced to perform contracts which were already in existence at the time the tax lien had attached. The IRS emphasized that the rights to the accounts represented by the glazing contracts were already in existence at the time the lien was filed; all that remained was to perform the preexisting contracts; the debtor has already "acquire[d] rights in or the use of collateral." Reduced to its essence, the IRS argument before the bankruptcy court, and repeated before us, is that First Interstate did nothing more than fund the debtor's performance of its contracts in its ordinary business operations; it did not enable the debtor to acquire a discrete new asset.

The bankruptcy court held for the IRS, ruling that "[u]nless the funds loaned to a debtor are used for the purpose of purchasing accounts directly, the lending creditor would not obtain a purchase money security interest in those accounts." Amended Findings of Fact and Conclusions of Law at 14, ¶ 13. According to the bankruptcy court, "First Interstate did not obtain a purchase money security interest in accounts because the funds loaned to the debtor did not enable the debtor to acquire accounts, but rather enabled the debtor to generate accounts." *Id.* The court reasoned that a "contrary ruling would elevate any loan to a purchase money status if the loan enabled the borrower to conduct its business and generate a profit," *id.*, and ruled that the Government had a prior lien against the proceeds of the contracts. *Id.* at 15, ¶¶ 14–15.

First Interstate appealed to the District Court from that part of the bankruptcy court's judgment that held it did not pos-

sess a security interest to trump the previous IRS lien. The District Court affirmed the bankruptcy court determination. First Interstate has appealed.

## III.

 As was the task of the bankruptcy and district courts, our responsibility is to construe the security interest provision of *Utah Code Ann.* § 70A–9–107(b). Under the U.C.C. and the Utah legislature's adoption of its key provisions, this purchase money security interest is generally manifested when taken or retained by the seller of collateral to secure all or part of its price. But such a security interest also may be created when a person gives value to enable a debtor to acquire rights in, or the use of collateral; this is the species of security interest asserted by First National Bank in these proceedings. New value may be given either in the form of advances or the incurring of an obligation. Such value must be used for this purpose in order to form the basis of this type of priority.

 By definition, purchase money security interests are available to lenders as well as sellers. A lender may acquire it in collateral to be purchased with a loan provided the proceeds are in fact so used. This special category of security interest is entitled to special priority because it is considered an exception to the first-to-file rule of priority. Accordingly, such an interest takes priority over any pre-existing lien on the theory that because the lender has augmented the capital assets of the borrower, previous creditors are not prejudiced.

It is undisputed that First Interstate agreed to, and did, lend money to the debtor to fund the performance of specific, identified contracts. It is also undisputed that the U.C.C. priority in question is given not only to lenders who permit a borrower to "acquire" collateral, but is conferred whenever the lender enables the borrower to "acquire rights in collateral." The debtor here already had acquired the collateral—the executory contracts—and thus the right to perform the contracts, and

accordingly, the federal tax lien attached to these executory contracts. First Interstate anchors its claim on the basis that it advanced the funds that enabled the debtor to "acquire rights in [this] collateral" by converting contingent rights into matured rights.

In support of its argument, First Interstate submits that this case should be governed by the reasoning of *In re Halprin*, 280 F.2d 407 (3d Cir.1960), where the Court of Appeals for the Third Circuit, in an opinion by Judge Hastie, protected a lender's contractual right to payment against a previously filed federal tax lien. In *Halprin*, the lender advanced funds to enable the debtor to perform a specific manufacturing contract, and took as security an assignment of the debtor's right to payment under the contract.

In that case, the court protected the purchase money lender, who by advancing funds, permitted the debtor to acquire a right to payment under the contract, and thus was able to look to those proceeds as collateral. However, *Halprin* is readily distinguishable from the case at bar. Relying on concepts of property law, the court said that the right to payment was no longer the property of the debtor because it had been assigned to the creditor. The court couched its decision on whether the taxpayer's interest qualified as "property" within the meaning of the federal tax lien statute. Having determined that any right the debtor had in the contracts had been assigned, the court reasoned that a tax lien on the debtor's property could have no effect on property which the debtor no longer owned.

In the case before us, First Interstate acknowledges that it was the debtor, not the bank, who owned the property and that a valid tax lien had attached to that property. It disputes only the priority of the lien vis-a-vis its security interest in that property. Having proceeded on this basis and having acknowledged the validity of the lien on the debtor's property, the lender cannot now avail itself of the teaching and reasoning of *Halprin*.

### IV.

We return then to our task of statutory construction. Professor Grant Gilmore, a primary drafter of the U.C.C., has written that the purchase money security interest provision was narrowly constructed and that such an interest in intangibles would be the extraordinary situation. In describing what could or could not qualify under the statute, he stated:

> Farm products which are grown or raised by the debtor (such as crops or the increase of a herd of livestock) cannot become the subject matter of a purchase money security interest, since the secured party's loan does not go directly into their purchase price. *Nor could such intangibles as accounts, contract rights,* chattel paper, or instruments normally be acquired by the debtor in a purchase money transaction.

Gilmore, *The Purchase Money Priority,* 76 Harv.L.Rev. 1333, 1385 (1963) (emphasis added).

### A.

It is clear that the drafters of the purchase money security interest provision in the U.C.C. used precise and narrow language. First, the lender must have given "value" by making advances or incurring an obligation. Second, the value must have been "to enable the debtor to acquire rights in or the use of collateral." Third, such value must have been "in fact so used." Comment 2 to the Official Text of the Code tells us that this requirement excludes "any security interest taken as security for or in satisfaction of a pre-existing claim or antecedent debt."

Given this narrow construction, we must determine whether the interest in the case before us fits within these three requirements.

### B.

Clearly, the lender, First Interstate, gave value. The problem is with the second prong that requires that the value must have been given "to enable the debtor to acquire rights in or the use of collateral." Without surmounting this second requirement we cannot reach the third. We are assisted in our task by previous court decisions that have discussed whether contract rights qualify as "collateral" under this U.C.C. provision.

In *Northwestern Nat. Bank Southwest v. Lectro System, Inc.,* 262 N.W.2d 678 (Minn.1977), the court faced the question of whether a "contract right" could be "collateral" under the second requirement. In *Lectro System,* the lender advanced money to subcontractors to enable them to complete their contract and took back a security interest in their contract right to payment. The lender claimed priority as a purchase money lender over a bank which had a prior perfected security interest in the contract right.

In rejecting the lender's claim, the court held that the loaned funds must be intended, and actually used, for the purchase of an identifiable asset and that "performance of a contract" is not such an asset. *Id.* at 680; *see also MBank Alamo Nat. Ass'n v. Raytheon Co.,* 886 F.2d 1449, 1454 (5th Cir.1989) (court declined "to expand the scope of special protection afforded a purchase money security interest [to an account receivable], lest in so doing [it] defeat the underlying purposes of the Code: to bring predictability to commercial transactions") (citation omitted); *In the Matter of Woodworks Contemporary Furniture, Inc.,* 44 B.R. 971, 973 (Bkrtcy.W.D.Wis. 1984) (lender did not enable debtor to acquire rights in a contract to which it was already a party thus it was not entitled to purchase money status). We agree with these analyses.

### C.

At the risk of being guilty of *ad terrorem* discourse, we believe that First Interstate's argument proves too much. If accepted, it would make virtually any loan incurred in the course of fulfilling pre-existing business obligations a purchase money loan if it enabled the debtor to operate its business and generate a profit. The conceptual underpinning of our commercial purchase money security tradition with its

concomitant priority attributes is that the extension of such funds reflects a contribution of property to the borrower's estate; accordingly, this extension does not prejudice creditors who are prior in time.

An important distinction exists between funds extended for asset acquisition and those extended for the ordinary operation of business. A bright-line demarcation must always exist between these two purposes. To accept the lender's contention in this case would be to blur, if not eliminate, that line.

### V.

■ Court precedent, comments of the Code drafters, and dictates of public policy concerning financing support the principle that the line of demarcation be respected. We see no reason to cross it here. Accordingly, we conclude that the right to perform the pre-existing executory contract in this case is not "collateral" or the "rights in collateral" within the requirements of the U.C.C.

### VI.

We have considered all of the contentions of the appellant and find them to be without merit. The judgment of the district court is AFFIRMED.